**NORTHEAST ENERGY ASSOCIATES,
et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,**

**UGI Utilities, Inc., et al.,Intervenors.**

**No. 97–1140.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 25, 1998.

Decided Oct. 20, 1998.

Charles H. Shoneman argued the cause for petitioners. With him on the briefs was Betsy R. Carr.

David H. Coffman, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were Jay L. Witkin, Solicitor, John H. Conway, Deputy Solicitor, and Susan J. Court, Special Counsel. Edward S. Geldermann and Joel M. Cockrell, Attorneys, entered appearances.

Michael J. Thompson, Jonathan L. Socolow and David A. Glenn were on the brief for intervenor Transcontinental Gas Pipe Line Corporation.

Before: EDWARDS, Chief Judge, WALD and SENTELLE, Circuit Judges.

WALD, Circuit Judge:

Transcontinental Gas Pipe Line Corporation ("Transco") transports natural gas through pipelines. It proposed changing numerous rates it charges for this service in a filing with the Federal Energy Regulatory Commission ("FERC" or "Commission"). In total, Transco increased its revenue under the proposal, but the filing called for decreases in two rates applicable exclusively to petitioners Northeast Energy Associates and North Jersey Energy Associates ("Energy Associates"). FERC accepted the filing, suspended the new rates for five months, and ordered a hearing, rejecting Energy Associates' request that the decreased rates applicable to it be implemented promptly and

suspended for only one day. FERC denied Energy Associates' petition for rehearing repeating its request for a one day suspension. Energy Associates now petitions for review of that denial. Because FERC failed to explain adequately its departure from past precedent and policy in suspending the rate decreases for five months, we grant the petition and remand to the agency to justify or remedy the departure.

## I. BACKGROUND

A natural gas pipeline operator must submit to FERC proposed changes in the rates it charges. *See* 15 U.S.C. § 717c(d). FERC determines whether the new rates are "just and reasonable." *See* 15 U.S.C. § 717c(a). The Natural Gas Act ("NGA") encourages quick action; absent a response within thirty days, the pipeline can put the proposed rates into effect. *See id.* FERC can accept the changes, allowing them to go into effect on the date proposed by the pipeline (as long as that date is at least thirty days after the proposal was submitted).[1] The Commission can also gain more time by accepting but suspending the new rates for up to five months and ordering a hearing. *See* 15 U.S.C. § 717c(e). While five month suspensions are typical, shorter suspension periods are frequently imposed when the maximum "may lead to harsh and inequitable results." *Columbia Gas Transmission Corp.,* 82 F.E.R.C. ¶ 61,301, at 62,200 (1998) (citing *Valley Gas Transmission, Inc.,* 12 F.E.R.C. ¶ 61,197 (1980)). If FERC does not render a decision by the end of a suspension period, the pipeline can implement the new rates. *See* 15 U.S.C. § 717c(e).

In a November 1, 1996, submission to FERC, Transco proposed to change many of its rates effective December 1, 1996. Overall, the proposal called for an $83 million annual increase in charges, but two rates— X–319 and X–320—actually decreased. X–319 and X–320 are incremental rates[2] that

---

1. "[F]or good cause shown," FERC may allow changed rates to go into effect sooner. 15 U.S.C. § 717c(d).

2. Under incremental pricing the costs of particular facilities are assigned to particular customers and recaptured by increasing the rates

charged to those customers. Under rolled-in pricing the costs of the facilities are added to the pipeline's total rate base and recaptured by an increase in the general rate charged to all customers in proportion to the pipeline capacity they use.

Transco charges for transporting natural gas to Energy Associates' cogeneration plants in Massachusetts and New Jersey. These incremental rates include a portion of Transco's systemwide administrative and general ("A&G") costs.[3]

On November 13, Energy Associates asked FERC to accept the revised X–319 and X–320 rates and to suspend them for only one day even if other rates in the same filing were suspended for a longer period. *See* Joint Appendix ("J.A.") at 80. This would allow Energy Associates to "immediately enjoy the *lower* incremental rate[s]." *Id.* (emphasis in original).

FERC accepted Transco's filing on November 29, but suspended all of the changes for the full five months. *See Transcontinental Gas Pipe Line Corp.*, 77 F.E.R.C. ¶ 61,235, at 61,954 (1996) ("*Transco I*"). It responded to Energy Associates' request directly by stating:

> This tariff sheet is part of an overall rate case filing that reflects increases and decreases in various costs. These rate schedules appear to contain both direct and allocated costs and therefore, it is not clear that the shortened suspension period would allow Transco to fully recover its costs.

*Id.* at 61,953. Speaking to the entire filing, the Commission added that a maximum length suspension would not produce harsh and inequitable results in this case. *Id.* at 61,954.

Energy Associates requested rehearing, again asking for a one day suspension for X–319 and X–320 so that it could immediately benefit from the decreased rates. It informed FERC that a five month delay in

implementation would cost it approximately $150,000.[4] Energy Associates argued that FERC's X–319 and X–320 suspension decision "departed from applicable precedent, violated the intent of the NGA to protect consumers, abused its discretion and failed to engage in reasoned decisionmaking." J.A. at 93. The request relied heavily on FERC's decision in *Tennessee Gas Pipeline Co.*, 70 F.E.R.C. ¶ 61,076 (1995) ("*Tennessee I*"), to suspend decreases in incremental rates for one day while suspending increases in the balance of the rates in the same filing for five months. Because some rates were to be reduced in *Tennessee I*, FERC considered a full length suspension of all rates harsh and inequitable. *Id.* at 61,202. Energy Associates called *Tennessee I*'s "fact situation virtually identical." J.A. at 98.

FERC denied rehearing on February 3, 1997. It stated that its earlier order "adequately addressed the issue raised by the Energy Associates," *Transcontinental Gas Pipe Line Corp.*, 78 F.E.R.C. ¶ 61,101, at 61,359 (1997), but added a new rationale in a footnote: "In any event, Transco would be under no obligation to move one portion of its rate filing into effect in advance of the rest of the filing even if we were to grant Energy Associates' request." *Id.* at n. 7. The footnote referred to two new procedural rules the Commission had recently adopted, 18 C.F.R. § 154.7(a)(9) and 18 C.F.R. §·154.206(b). Section 154.7(a)(9) requires a pipeline, when filing rate changes, to include:

> A motion, in case of minimal suspension, to place the proposed rates into effect at the end of the suspension period; or, a specific statement that the pipeline reserves its right to file a later motion to place the

---

*TransCanada PipeLines Ltd. v. FERC*, 24 F.3d 305, 307 n. 1 (D.C.Cir.1994). *See also Tennessee Valley Mun. Gas Ass'n v. FERC*, 140 F.3d 1085, 1087–88 (D.C.Cir.1998).

**3.** The record, while not entirely clear, suggests that the A&G costs include operation and maintenance ("O&M") and supervisory and engineering ("S&E") components.

**4.** The refund provision in the NGA does not protect Energy Associates. When FERC suspends a rate change of any kind, it typically attaches a refund condition to protect the pipe-

line's customers if the agency has not completed its review by the end of the suspension period. *See* 15 U.S.C. § 717c(e). Thus, if proposed increases go into effect after the suspension period but are ultimately found to be too high, the pipeline must refund its excessive receipts. If the increases are ultimately approved, however, the pipeline cannot collect from its customers the difference between the new and old rates that it had to forego during the suspension period. Conversely, if proposed decreases are suspended but ultimately approved, the customer is not entitled to a refund of the difference between the old and new rates during the suspension period.

proposed rates into effect at the end of the suspension period.

When the pipeline "reserves its right" or by default, when it does not follow either option, the rates do not go into effect at the end of the suspension period until the pipeline does file a motion.[5] *See* 18 C.F.R. § 154.206(b); Filing and Reporting Requirements for Interstate Natural Gas Company Rate Schedules and Tariffs, 60 Fed.Reg. 52,960, 52,974 (1995) ("Order 582") (explanation of 18 C.F.R. § 154.206 accompanying Final Rule). Transco's rate change proposal in this case took the "reserves its right" course and included a statement that "Transco will file a separate motion, in accordance with . . . 18 C.F.R. § 154.206, to comply with the directives in the suspension order. . . ." J.A. at 7.

Energy Associates filed a timely petition for review asking this court to order FERC to require retroactive implementation of the decreased X–319 and X–320 rates, without any suspension, along with appropriate refunds to Energy Associates for the intervening period between Transco's proposed effective date and the date the lower rates actually went into effect.

## II. Analysis

### A. *Standing*

■ We begin with FERC's argument that Energy Associates lack standing to challenge the five month suspension of the X–319 and X–320 rates. Article III standing requires a plaintiff to "demonstrate that he has suffered injury in fact, that the injury is fairly traceable to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997) (quotation marks and citations omitted). FERC concedes, and we agree, that Energy Associates alleges an in-

jury, but argues that the second and third prongs—causation and redressability—are lacking. Because Energy Associates only asked the Commission for a one day suspension (as opposed to acceptance without any suspension), FERC explains that had the request been granted the § 154.7(a)(9) and § 154.206(b) motion rule would have prevented the decreases from taking effect without a motion by Transco. The Commission contends that Transco would.not have filed such a motion while the increases remained suspended for five months.[6] Thus, even if FERC had given Energy Associates what it asked for, Energy Associates would not have gotten its lower rates, so that FERC's action was not the cause of its injury.

FERC overlooks some important points, however. Although Energy Associates' specific request was for a one day rather than no suspension, its desire for immediate implementation of the decreased rates was manifest at all times, *see* J.A. at 80, 91, and FERC clearly could have effectuated this result by accepting the X–319 and X–320 rates without suspension, thus obviating the need for any motion by Transco under its new rules. Indeed, this was the Commission's professed policy for handling most rate decrease proposals. *See* Filing and Reporting Requirements for Interstate Natural Gas Company Rate Schedules and Tariffs Final Rule; Order on Rehearing, 61 Fed.Reg. 9613, 9616 (1996) ("Order 582–A"). Thus FERC can be said to have caused Energy Associates' injury by refusing to follow its regular practice in not suspending a decrease in rates. As to redressability, we are concerned primarily with Energy Associates' contention, raised in the request for rehearing and before this court, that FERC departed from past precedent and policy in suspending the decreases. If we find that FERC so departed without adequate expla-

---

**5.** This rule was evidently adopted to bring Commission practices into line with 15 U.S.C. § 717c(e), which states that, "[i]f the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate . . . shall go into effect." *See* Filing and Reporting Requirements for Interstate Natural Gas Company Rate Sched-

ules and Tariffs, 60 Fed.Reg. 52,960, 52,974 (1995). Previously, rates suspended for a minimal period would take effect without a motion.

**6.** Transco intervened and informed the court that, consistent with FERC's position, it would not have filed a motion to put the decreases into effect while the increases were suspended.

nation, remand to the Commission is an appropriate remedy. On remand FERC might determine that precedent and policy dictate acceptance of the decreases without suspension. This possibility, though not a certainty, is sufficient to meet the redressability requirement. *See Motor & Equip. Mfrs. Ass'n v. Nichols,* 142 F.3d 449, 457–58 (D.C.Cir. 1998) (redressability satisfied because court's decision to vacate EPA rule would give petitioner opportunity for favorable outcome in new rulemaking); *see also Community Nutrition Institute v. Block,* 698 F.2d 1239, 1249 (D.C.Cir.1983) ("redressability element . . . does not prevent a court from hearing a case which may ultimately be unsuccessful"), *rev'd on other grounds,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). Energy Associates therefore meets the three standing requirements. The higher rates it paid during the five month suspension constitute an injury traceable to FERC's actions that a favorable decision from this court may redress.

B. *Consistency with Agency Precedent and Policy*

 FERC must always give reasons for suspending proposed rate changes. *See* 15 U.S.C. § 717c(e). We review suspension decisions to determine whether the reasons given are "in some way [ ] related to FERC's interim or ultimate inquiries." *Exxon Pipeline Co. v. United States,* 725 F.2d 1467, 1473 (D.C.Cir.1984).[7] Even if this test is satisfied, however, "remand . . . for further articula-

tion of reasons" is appropriate if FERC "impos[es] two different suspension lengths in cases that [a]re absolutely indistinguishable, and . . . fail[s] to offer even summary reasons to explain the difference." *Id.* at 1474; *cf. Bush–Quayle '92 Primary Comm. v. FEC,* 104 F.3d 448, 453 (D.C.Cir.1997) (" 'an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute' " (quoting *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970)). Energy Associates argue that FERC's decision runs afoul of this second test because the Commission departed without explanation from the principles laid down in *Tennessee I* and the precedential effect of the later decision in the same case affirming the suspension order, *Tennessee Gas Pipeline Co.,* 71 F.E.R.C. ¶ 61,399 (1995) ("*Tennessee II*").[8] As noted above, in *Tennessee I* FERC suspended incremental rates proposed for decrease for one day and other rate increases in the same filing for five months.[9]

As Energy Associates claim, the relevant facts addressed by FERC in its *Tennessee* opinions appear comparable to those in this case. Both rate filings involved numerous individual rate changes and a net increase in revenue for the pipeline. Like Transco's,

---

7. Although *Exxon* involved FERC's suspension of oil pipeline rates under the Interstate Commerce Act, the case provides an appropriate framework for reviewing FERC's suspension decision here. The statutory provision considered in *Exxon* is identical in all relevant respects to the Natural Gas Act's suspension provision. *Compare* 15 U.S.C. app. § 15(7) (Interstate Commerce Act) *with* 15 U.S.C. § 717c(e) (Natural Gas Act). *Exxon* itself noted that in construing statutes with virtually identical suspension provisions the case law applying either is applicable to the other. *See Exxon Pipeline Co.,* 725 F.2d at 1470 & n. 9.

8. We reject FERC's contention on appeal that there was no need to distinguish *Tennessee I* and *II* in *Transco I* and the denial of rehearing because the *Tennessee* decisions have no precedential weight. FERC points out that it obtained a voluntary remand after *Tennessee II* was appealed to this court but before the appeal was

heard. At approximately the same time, it promulgated the new motion filing rule which it admits is in conflict with one aspect of its *Tennessee II* ruling, *i.e.,* that FERC can order a pipeline to implement promptly a rate change after a minimal suspension period without a motion. The new rule, however, only affects the precedential significance of that one aspect of *Tennessee II.* The remainder of *Tennessee II* has not been withdrawn or vacated and FERC itself has recently cited *Tennessee II. See Panhandle Eastern Pipe Line Co.,* 82 F.E.R.C. ¶ 61,163, at 61,602 n. 28 (1998).

9. Treating different rates within a single filing differently for suspension purposes is not by any means unique to *Tennessee I* and *II. See Columbia Gulf Transmission Co.,* 77 F.E.R.C. ¶ 61,225 (1996); *Colorado Interstate Gas Co.,* 75 F.E.R.C. ¶ 61,090 (1996); *Green Mountain Power Corp.,* 59 F.E.R.C. ¶ 61,213 (1992).

Tennessee's filing also decreased certain incremental rates (the NET/T–180 rates). The X–319 and X–320 rates include some allocated costs; although not explicitly discussed in *Tennessee I* or *II*, a third opinion issued eight months later makes clear that the NET/T–180 rates included a proportionally allocated share of systemwide O&M and A&G costs. *See Tennessee Gas Pipeline Co.*, 74 F.E.R.C. ¶ 61,174, at 61,608–09 (1996).

Despite these similarities, FERC stated that suspending Tennessee's decreased rates for five months would be harsh and inequitable, but reached the opposite conclusion here and upheld the five month suspension for the X–319 and X–320 rates. Contrary to *Exxon*'s requirement that it explain the different outcomes, FERC did not mention *Tennessee I* or *II* at all.

The three reasons FERC did give in *Transco I* for denying Energy Associates' request—the decreased rates were "part of an overall rate case filing that reflects increases and decreases in various costs," "it is not clear that the shortened suspension period would allow Transco to fully recover its costs," and the decreased rates "appear to contain both direct and allocated costs"—also fall short of satisfying *Exxon*. Each reason refers to facts that appear to be identical in the *Tennessee I* and *II* filing. Moreover, the first two reasons were explicitly considered and rejected in *Tennessee II*. The pipeline in *Tennessee II* argued that isolating the NET/T–180 rates was improper because they were part of an "integrated package." *Tennessee II*, 71 F.E.R.C. at 62,583. FERC responded:

> In a rate filing in which many revised tariff pages and rate schedules are filed, the Commission may accept some revised tariff sheets as filed, suspend some sheets, and reject others. The Commission has never considered itself bound to accept, suspend, or reject as a single package all the individual tariff sheets that compose a rate filing.

*Id.* at 62,584 (footnote omitted). The pipeline also argued that putting the decreases into effect five months before the increases could cost it $1.5 million. *See id.* at 62,585. FERC noted the relative insignificance of this amount in the context of a proposal with an $820 million cost of service.[10] *See id.* The Commission further explained that under the NGA a pipeline bears the risk that rate changes will take effect at different points, *see id.*, and that the alternative would force "the customers with the rate decrease ... to pay the higher, unsupported rates for at least five months, and possibly longer, with no possibility of refunds." *Id.* at 62,-585–86. The third reason (direct and allocated costs), while not explicitly considered in *Tennessee I* or *II*, appears inconsistent with FERC's response to a similar argument in *Tennessee II*. The pipeline there asserted that the decrease in the NET/T–180 rates was attributable to a shift of certain costs from those rates to others slated to be raised.[11] *See id.* at 62,585. The decreased and increased rates were therefore partially linked because, if the Commission ultimately found that the shifted costs did not belong in the increased rates, those costs would likely be returned to the NET/T–180 rates. Similarly, if FERC determines that Transco's proposal places too great a share of the systemwide costs in the increased rates, the decreased rates could ultimately go up. Yet FERC did not consider this possibility sufficient to require identical suspension periods in *Tennessee II*. It is hard then to see why the presence of some unspecified allocated costs in the X–319 and X–320 incremental rates justifies a different conclusion.

The adequacy of the additional reason given by the Commission for suspending X–319 and X–320 for five months in the order on rehearing in this case requires further exploration of FERC's new motion filing rule. Before the new rule came into being, whenever FERC suspended a proposed rate for a

---

**10.** The numbers in this case demonstrate that the impact on Transco is even smaller. Over five months, the decrease represents a savings to Energy Associates of approximately $150,000 and the cost of service for the entire rate filing is $793,104,220. J.A. at 2.

**11.** Although FERC was not convinced of the accuracy of this claim, it responded as if it were true. *See Tennessee II*, 71 F.E.R.C. at 62,585 & n. 31.

nominal period such as one day, it typically ordered the pipeline to put the new rate into effect promptly thereafter; no motion was required. *See id.* at 62,586–87. Decreases were "usually given a minimal, or momentary suspension." *Id.* at 62,584. These norms reflected FERC's policy, followed in *Tennessee II,* of assuring prompt implementation of rate decreases.

The new motion rule, however, makes it difficult if not impossible for the Commission to maintain that norm because a pipeline can delay implementation after the briefest of suspensions in the case of rate decreases simply by withholding the required motion. Yet in promulgating the motion rule FERC reiterated that the prompt implementation policy for decreases remained intact. Speaking to the new rule (and other changes), the Commission stated that it was "not changing its substantive rate policies in this rulemaking, but rather bringing its filing requirements and procedures up to date to match its current substantive policies." Order 582, 60 Fed.Reg. at 52,962. FERC also spoke directly to the concern that a pipeline could block prompt implementation of a decrease:

> Usually the Commission accepts a proposed rate decrease without suspension. Where the Commission does not suspend the effective date of a proposed decrease, a ... motion is not required and the proposed decrease goes into effect on the date proposed by the pipeline in its filing. However, it may be appropriate, under certain circumstances to suspend a rate decrease and in such instances a motion to place the rates into effect would be required; for example, where it may not be clear initially if it is a rate decrease due to pancaked cases.

Order 582–A, 61 Fed.Reg. at 9616.[12] This latter statement in particular reveals FERC's awareness of the problem created by the motion rule and its decision to work around it by accepting decreases without suspension in ordinary cases. When the rule was challenged on appeal FERC also told this court that "there is no reason for assuming that the Commission will depart from its policy of attempting to place decreased rates into effect promptly." Br. for Resp't at 19, *JMC Power Projects v. FERC,* 116 F.3d 941, 1997 WL 358188 (D.C.Cir.1997) (unpublished disposition) (Addendum to Initial Br. of Pet'rs).

Given these assurances, FERC is not in a position to rely on the new motion rule as a principle reason for suspending the X–319 and X–320 rates for five months without some further explanation of the rule's impact on its previous substantive policy as to suspensions of rate decreases. Like the three prior reasons offered in *Transco I,* the fourth reason given on the denial of rehearing does not satisfy *Exxon*'s requirement that the Commission justify any decision to treat Transco's rate change filing differently from similar proposals in *Tennessee I* and *II* and other cases, and is inconsistent with its pronouncements on the purpose and effect of its new motion rule.

### III. CONCLUSION

The decision to suspend the X–319 and X–320 rate decreases for five months appears to be a departure from precedent and policy that the Commission has not yet adequately explained. We therefore grant the petition and remand the suspension order as to X–319 and X–320 so that FERC may justify or remedy the departure.

*So ordered.*

---

12. "Pancaked cases" describes the situation where multiple proposals to change a rate are simultaneously pending before FERC. What appears to be a decrease may turn out to be an increase if a previously proposed larger decrease is subsequently granted. For example, a pipeline charging a rate of one dollar might propose a decrease to eighty cents. Months later the one dollar rate might still be in effect if FERC has not determined whether the eighty cents proposal is "just and reasonable." At that point, the pipeline might propose a rate of ninety cents, an apparent decrease from the current rate. If the eighty cents rate is later approved, however, the ninety cents proposal becomes an increase. FERC has not suggested here that the X–319 and X–320 proposals could turn out to be increases.