158 F.3d 146
 332 U.S.App.D.C. 336, 58 Soc.Sec.Rep.Ser. 567
 PARKVIEW MEDICAL ASSOCIATES, L.P., d/b/a ParkView Regional
Medical Center, by Quorum Health Group of
Vicksburg, Inc., its sole general
partner, Appellant,
v.
Donna E. SHALALA, Secretary of the Department of Health and
Human Services, Appellee.
 No. 97-5262.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 2, 1998.
Decided Oct. 20, 1998.
 
 [332 U.S.App.D.C. 337] Jonathan L. Rue argued the cause for appellant. With him on the briefs was Ronald N. Sutter.
 Laura E. Ellis, Attorney, U.S. Department of Health & Human Services, argued the cause for appellee. With her on the brief were Frank W. Hunger, Assistant Attorney General, U.S. Department of Justice, Wilma A. Lewis, U.S. Attorney, Harriet S. Rabb, General Counsel, U.S. Department of Health & Human Services, and Lawrence J. Harder, Attorney. James P. Ellison, Attorney, entered an appearance.
 Before: WALD, WILLIAMS and TATEL, Circuit Judges.
 WILLIAMS, Circuit Judge:
 
 
 1
 ParkView Medical Associates closed its purchase of a hospital in Vicksburg, Mississippi on November 1, 1990 and renamed the hospital ParkView Regional Medical Center.[1] Because of the purchase, the hospital filed one report on its wages for the last four months under the prior ownership (the first four months of its July 1 to June 30 reporting year), and another for the first eight months of the new ownership (thus closing out the reporting year). Had it filed a single report for the full twelve-month period, it would have qualified for reclassification as "urban" rather than "rural," and would thus have been entitled to more generous Medicare reimbursement. ParkView sued the Secretary of Health and Human Services, claiming that the rules that brought about denial of reclassification were arbitrary and capricious. Although the application of those rules in this case has produced a seeming anomaly, ParkView has not shown the regulations to be arbitrary or capricious, and we accordingly affirm the district court's grant of summary judgment for the defendant.
 
 
 2
 * * *
 
 
 3
 Under Part A of Medicare, most hospitals are reimbursed for their services to patients through a "fiscal intermediary," a private organization that acts as a go-between under agreement with the Secretary. See 42 U.S.C. § 1395h. A hospital receives a predetermined amount per patient discharged in each particular "diagnosis related group," an amount set annually by the Secretary. See id. § 1395ww(d).
 
 
 4
 Because hospital costs tend to be higher in urban areas than in rural, the Secretary's reimbursement rates vary with a hospital's geographic area. First, the rates are in part based on the "average standardized amount," a figure calculated separately for "large urban," "urban," and "rural" areas. See id. § 1395ww(d)(3)(D). Second, the rates are also in part based on the "wage index" for a particular area, or the relative wage level for that area compared to the national wage level. See id. § 1395ww(d)(3)(E). Hospitals are initially classified according to actual location, but they may apply for reclassification into a nearby area for purposes of using that other area's standardized amount or wage index. See id. § 1395ww(d)(10). Such applications are made to the Medicare Geographic Classification Review Board, which resolves the claims under guidelines set out by the Secretary. Its decisions are appealable to the Secretary. See Id.
 
 
 5
 In September of 1993, ParkView sought reclassification for wage index purposes from the rural Mississippi area to the urban Jackson, Mississippi area during federal fiscal year 1995. In order to qualify for such reclassification, a hospital must show--among other things--that its "average hourly wage is at least 108 percent of the average hourly wage of hospitals in the area in which the hospital is located." 42 C.F.R. § 412.230(e)(1)(iii). The data used for this comparison are the "data from the HCFA hospital wage survey used to construct the wage index in effect for prospective payment purposes during the fiscal year prior to the fiscal year for which the hospital requests reclassification," id. § 412.230(e)(2)(i), i.e., the data for the hospital itself that the Secretary used in creating her wage index. As ParkView requested reclassification for 1995, it had to meet the 108% test with the data used to construct the fiscal year 1994 wage [332 U.S.App.D.C. 338] index, which the Secretary had just finalized and was about to put into effect.[2]
 
 
 6
 ParkView Medical Associates had purchased the hospital on November 1, 1990. A hospital that experiences a change in ownership must file a terminating cost report at the end of the seller's ownership, see id. § 413.24(f)(1), and has the option of changing its cost reporting period for the future, see id. § 413.24(f)(3). ParkView kept its old cost reporting period: July 1 to June 30. It thus filed two consecutive short-period reports: a four-month report for July 1, 1990 to October 31, 1990 and an eight-month report for November 1, 1990 to June 30, 1991--the normal end of its reporting period.
 
 
 7
 But this brought ParkView up against another rule. The 1994 index was to be based on "data for hospital cost reporting periods beginning on or after October 1, 1989 and before October 1, 1990 (FY 1990)." 58 Fed.Reg. 46,293 (1993). Unfortunately for ParkView, the beginning date of its eight-month report was a month after the end of the October-to-October window; thus the report was not included in the 1994 wage index calculation. The result: ParkView could not use the data from the eight-month report to show that it satisfied the 108% test for reclassification. See 42 C.F.R. § 412.230(e)(2)(i). If calculated from a combination of the two short-period reports' data, the average hourly wage would have been 119.6589% of the local average. Apparently because of seasonal fluctuations, however, calculations based on only the four-month data fell short of the 108% criterion by a hair--107.5948%. The Medicare Geographic Classification Review Board accordingly denied ParkView's request for 1995 reclassification, and the Secretary affirmed the denial.
 
 
 8
 * * *
 
 
 9
 Judicial review of the denial itself is barred. See 42 U.S.C. § 1395ww(d)(10)(C)(iii)(II) ("The decision of the Secretary shall be final and shall not be subject to judicial review."). But this bar leaves hospitals free to challenge the general rules leading to denial. See Universal Health Servs. v. Sullivan, 770 F.Supp. 704, 710-12 (D.D.C.1991); see also Athens Community Hosp. v. Shalala, 21 F.3d 1176 (D.C.Cir.1994) (striking down adjacency rule governing reclassifications). But cf. Skagit County Public Hosp. Dist. No. 2 v. Shalala, 80 F.3d 379, 386-87 (9th Cir.1996) (finding review precluded if challenge brought "only to achieve reversal of the reclassification decision"). Among those rules, ParkView does not question the requirement of 42 C.F.R. § 412.230(e)(2)(i) that to satisfy the 108% requirement a hospital must use the data that had been used in constructing the wage index. Its attack on the Secretary's strict reliance on data from cost reports starting within the October-to-October window for those purposes, then, is necessarily an attack on the construction of the 1994 wage index.[3]
 
 
 10
 We first note that the Secretary had good general reasons for many of the elements in her data collection method for this index. By using data for periods for which reports were already filed with fiscal intermediaries and audited, rather than a single uniform period, she avoided any need for Procrustean adjustments of existing data or for generation of entirely new data. See 58 Fed.Reg. 46,302 (1993) ("We believe that the FY 1990 data is much more accurate than any we have used previously.... [Those] data have been subjected to comprehensive edits and revisions, both before and after the publication of the proposed rule."). Similarly, the use of a fixed one-year time window (in this case the federal fiscal year), within which the [332 U.S.App.D.C. 339] start of a reporting period must fall, obviously advances the interest in getting more-or-less contemporaneous data that can be updated annually, as 42 U.S.C. § 1395ww(d)(3)(E) requires. See 58 Fed.Reg. 30,236 (1993) (identifying FY 1990 window as response to this statutory requirement).
 
 
 11
 The real question, then, is whether it was arbitrary and capricious for the Secretary to fail to adopt a rule that would more elegantly fit ParkView's special circumstance. Here, inclusion of ParkView's two short periods would have produced the precise equivalent of inclusion of a single one-year period starting July 1, 1990, and the Secretary does not offer any reasons to contest ParkView's view that use of the one-year data in constructing the wage index (and thus in adjudicating ParkView's reclassification claim) would have yielded a more accurate result.
 
 
 12
 But in considering ParkView's contention we cannot be blinded by hindsight. Despite being notified in April 1993 that the Secretary's preliminary 1994 wage index calculation used only the four-month report, ParkView made no protest at the time. Indeed, it failed even to allude to the issue until it filed its reclassification request in late September, weeks after the index at issue had been finalized on September 1, 1993. See 58 Fed.Reg. 46,270 (1993). This is fatal to ParkView's claim that the Secretary failed to explain this feature of her choice. "[A]n agency 'cannot be expected to make silk purse responses to sow's ear arguments.' Similarly, a zero argument deserves a zero response." NRDC v. EPA, 937 F.2d 641, 647-48 (D.C.Cir.1991) (quoting City of Vernon v. FERC, 845 F.2d 1042, 1047 (D.C.Cir.1988)). Since ParkView entirely failed to challenge the Secretary's rule in the process of its adoption, we cannot fault the Secretary for her failure to refute the unvoiced attack.
 
 
 13
 Hindsight similarly gives a false sheen to the alternative now proposed by ParkView: "The Secretary should have considered the possibility of using aggregate data from more than one cost report for providers who continue in the program after the sale of a facility and do not change their fiscal year." In other words, according to ParkView, the Secretary should have structured an exception fitted to ParkView's particular case: where two short periods (one starting after the close of the October-to-October window) add up to exactly one year starting within the window. Unless such period combinations are quite common, the Secretary might reasonably believe that the added precision would not justify the added complication. Such a conclusion would be especially defensible in the absence of evidence that the seasonal variations that so unluckily affected ParkView are often decisive. Further, and critically, ParkView has not shown that the situations covered by its proposed exception were so common, or that application of the Secretary's exceptionless rule would ordinarily lead to consequences so outrageous, that it was arbitrary and capricious for the Secretary not to anticipate and correct the problem on her own--despite silence from the parties most directly concerned.
 
 
 14
 To point up what it sees as the egregiousness of the Secretary's supposed error, ParkView notes Secretarial determinations that in its view show the common sense necessity of addressing the glitch of which it has run afoul. First, it notes that the Secretary has permitted inclusion of cost reports for hospitals with cost reporting periods longer than 52 weeks. But the periods involved were only very slightly in excess of 52 weeks, and the decision was, like the use of short-period reports, part of an effort to include data from as many hospitals as possible. See 58 Fed.Reg. 46,298 (1993) ("The data were included because no data from these hospitals would be available for the cost reporting period described above, and particular labor market areas might be affected due to the omission of these hospitals."). This concern seems to us distinct from ParkView's concern here: whether the data from a particular included hospital were sufficiently accurate or representative.
 
 
 15
 ParkView also says that when the Secretary, in constructing the 1995 wage index calculation, was confronted with two ParkView reports that satisfied the October-to-October test (the report for the eight-month period starting November 1, 1990 and the report for the full year starting July 1, 1991), [332 U.S.App.D.C. 340] the Secretary excluded the short-period report. But we do not see how the Secretary's decision to rely on a full year of ParkView's experience, rather than the year plus an additional eight months, speaks to the rationality of excluding periods that do not start in the October-to-October window.
 
 
 16
 ParkView can, of course, always propose a change in the regulations, and if it confronted the Secretary with a specific alternative (and perhaps with data as well), Secretarial intransigence in favor of the present rule might be arbitrary and capricious. See Health Insurance Ass'n of America v. Shalala, 23 F.3d 412, 417 (D.C.Cir.1994) (noting contingent character of arbitrary and capricious classification). On the present record, however, we cannot so characterize the method the Secretary used to calculate the 1994 wage index. We therefore affirm the grant of summary judgment.
 
 
 17
 So ordered.
 
 
 
 [1]
 Except when otherwise specified, we use "ParkView" to refer to both the partnership and the hospital
 
 
 [2]
 The fiscal year 1994 wage index affected reimbursements to hospitals for discharges occurring on or after October 1, 1993 and before October 1, 1994. 58 Fed.Reg. 46,293 (1993)
 
 
 [3]
 ParkView repeatedly refers to its challenge as one to the Secretary's "annualization" policy. It is true that she provided for annualization of cost reports shorter or longer than a year--that is, "dividing the data by the number of days in the cost report and then multiplying the results by 365." 58 Fed.Reg. 46,298 (1993). ParkView's claim, however, is not that the Secretary somehow distorted the wage index by giving short cost reports excessive weight, but that the Secretary wrongly made no provision for inclusion of the second short-period report. Indeed, since the 108% comparison is made on average hourly wages, it is not apparent that non-annualization would have had any effect at all on ParkView's reclassification claim