# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued March 22, 2016          Decided July 26, 2016

No. 15-5163

FLORIDA HEALTH SCIENCES CENTER, INC., DOING BUSINESS AS
TAMPA GENERAL HOSPITAL,
APPELLANT

v.

SECRETARY OF HEALTH AND HUMAN SERVICES,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-00791)

---

*Stephanie A. Webster* argued the cause for appellant. With her on the briefs was *Hyland Hunt*.

*Abby C. Wright*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Alisa B. Klein*, Attorney, *William B. Schultz*, General Counsel, U.S. Department of Health and Human Services, *Janice L. Hoffman*, Associate General Counsel, *Susan Maxson Lyson*s, Deputy Associate General Counsel for Litigation, and *Jonathan C. Brumer*, Attorney.

Before: GRIFFITH and KAVANAUGH, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

GRIFFITH, *Circuit Judge*: Tampa General Hospital receives federal funds for serving patients who cannot pay for the healthcare they receive. To determine how much federal funding goes to each hospital for providing such care, the Secretary of the U.S. Department of Health and Human Services (HHS) makes certain "estimates" as required by the Affordable Care Act. Although the Act bars judicial review of the Secretary's estimates, Tampa General seeks to challenge the data underlying them. We hold that the bar on judicial review of the Secretary's estimates precludes review of the underlying data as well.

I

Tampa General Hospital serves a large share of Tampa's low-income population. The federal government has long compensated hospitals like Tampa General for serving low-income patients by disbursing funds through a system known as Disproportionate Share Hospital (DSH) payments. *See* 42 U.S.C. § 1395ww(d)(5)(F) (1988). Historically, HHS calculated a hospital's DSH payment based on the number of days per year that the hospital served Medicaid and low-income Medicare patients. This calculation did not factor in the costs to the hospitals of "uncompensated care," which they provide to patients who have no means to pay, whether through federal programs or otherwise. *See* Medicare Program Final Rule, 78 Fed. Reg. 50,496, 50,622, 50,634-35 (Aug. 19, 2013).

The Affordable Care Act revised the process for calculating DSH payments. The new formula, which took effect in 2014, bases DSH payments largely on the

uncompensated care hospitals provide. *See* 42 U.S.C. § 1395ww(r) (2012); 78 Fed. Reg. at 50,622. HHS pays each hospital 25% of the amount it received under the old formula, 42 U.S.C. § 1395ww(r)(1), then adds more based in part on the Secretary's "estimate" of the percentage of the nation's overall uncompensated care that each hospital provides, *id.* § 1395ww(r)(2)(C).

To implement this change, the Secretary issued a final rule describing HHS's methodology for calculating DSH payments for 2014. 78 Fed. Reg. at 50,627-47. The Secretary decided to estimate each hospital's amount of uncompensated care, one part of the DSH payment, by looking to the number of days spent in each hospital by Medicaid patients and low-income Medicare patients who receive Supplemental Security Income benefits (Medicare SSI). *Id.* at 50,636-40. This number is then divided by the total number of days that such patients spent in *all* eligible hospitals to determine each hospital's share of the nation's uncompensated care. In other words, the Secretary decided to use each hospital's number of *insured* Medicaid and Medicare SSI patients as a proxy for its number of low-income *uninsured* patients. The Secretary reasoned that researchers often treat these two groups similarly, and that the proxy data was reliable because it had been "historically publicly available, subject to audit, and used for payment purposes." *Id.* at 50,635-37.

Hospitals keep track of the number of Medicaid patients served by submitting annual reports to HHS. HHS decided to use data from the hospitals' 2010/2011 reports, which offered "the most recently available" information. *Id.* at 50,638. If hospitals determine that the initial figures they submitted were inaccurate, they can amend their annual reports. Mindful of this possibility, HHS picked the March 2013 updates as the most recent data it would use. *Id.* at 50,641-42. HHS would not use data submitted after the deadline when calculating

DSH payments for 2014 because there would not be enough time to ensure its accuracy with an audit. *Id.* at 50,647.

Even so, Tampa General sought to give the Secretary new data in April 2013. When the Secretary refused to use the data, Tampa General filed suit in district court, arguing that the Secretary's reliance on "obsolete" data rather than "the most recent data available" violated the Administrative Procedure Act and the Medicare statute. *Fla. Health Scis. Ctr., Inc. v. HHS*, 89 F. Supp. 3d 121, 126 (D.D.C. 2015). Tampa General claimed that the data submitted in April 2013 established that it was entitled to $3 million more than the Secretary originally calculated. *Id.* at 129.

The district court dismissed the hospital's claim for lack of subject matter jurisdiction, holding that 42 U.S.C. § 1395ww(r)(3), which precludes judicial review of the Secretary's "estimate" of a hospital's amount of uncompensated care, bars review of the Secretary's choice of data used in determining that estimate. The district court reasoned that any other conclusion would be an end run around the bar on review. *Florida Health*, 89 F. Supp. 3d at 129.

Tampa General timely appealed, and we have jurisdiction under 28 U.S.C. § 1291.

II

We review de novo the district court's dismissal for lack of subject matter jurisdiction, taking Tampa General's allegations as true and drawing all reasonable inferences in its favor. *Council for Urological Interests v. Sebelius*, 668 F.3d 704, 713 (D.C. Cir. 2011). Although it is Tampa General's burden to establish subject matter jurisdiction, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), we apply a

presumption in favor of judicial review of agency action and read statutory bars on judicial review narrowly. *El Paso Nat. Gas Co. v. United States*, 632 F.3d 1272, 1276 (D.C. Cir. 2011). But the presumption in favor of review can be overcome by "specific language" in the statute that is a "reliable indicator" of Congress's intent to bar review. *Tex. Alliance for Home Care Servs. v. Sebelius*, 681 F.3d 402, 408 (D.C. Cir. 2012) (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)).

We find such a reliable indicator here and affirm the district court.

A

Tampa General seeks to challenge the Secretary's refusal to use the most recent available data to estimate the hospital's 2014 DSH payment. But the Affordable Care Act bars "administrative or judicial review" of "[a]ny estimate of the Secretary" or "[a]ny period selected by the Secretary" to determine each hospital's DSH payment. *See* 42 U.S.C. § 1395ww(r)(3).[1] We recently held that virtually identical language in another statute "unequivocally precludes review" of the agency action that falls within the bar. *Texas Alliance*, 681 F.3d at 409 ("[T]hat there be '*no* administrative or judicial review' under the . . . statutes '*or otherwise*' unequivocally precludes review of the Secretary's actions [listed in the judicial-review bar]."). Accordingly, we cannot review the Secretary's choice of data here if that decision "is

---

[1] The judicial review bar provides in full: "There shall be no administrative or judicial review under section 1395ff of this title, section 1395*oo* of this title, or otherwise of the following: (A) Any estimate of the Secretary for purposes of determining the factors described in paragraph (2). (B) Any period selected by the Secretary for such purposes." 42 U.S.C. § 1395ww(r)(3).

of the sort shielded from review." *Id.* (quoting *Amgen, Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004)). We conclude that it is.

Tampa General concedes that the Act bars judicial review of the Secretary's "estimate" of the hospital's "amount of uncompensated care." 42 U.S.C. § 1395ww(r)(2)(C)(i) (providing that this "amount" is to be "estimated by the Secretary"). But Tampa General argues that we *can* review the underlying data on which the Secretary relied, because an "estimate" is not the same thing as the "data" on which it is based. The estimate is an output, and the data are an input. Tampa General notes that the statute requires the Secretary to base her estimates on "appropriate" data, *id.*, and urges that its challenge is to the Secretary's reliance on inappropriate data, not her methodology for estimating uncompensated care.

We rejected a similar argument in *Texas Alliance*. 681 F.3d at 409-10. There, HHS deemed suppliers of certain healthcare products ineligible for a Medicare contract because they had failed to meet the financial standards HHS had set forth in a regulation. Although the statute precluded judicial review of, among other things, "the awarding of contracts," the suppliers brought a challenge to the financial-standards regulation. *Id.* at 409 (quoting 42 U.S.C. § 1395w-3(b)(11)(B)). The suppliers argued that they could challenge the financial standards, even though those standards affected the Secretary's decision whether to award a contract, because only the ultimate contract decision was barred from review. *Id.* at 410. In other words, the suppliers sought to challenge an input (the financial standards), contending that only review of the output (the awarding of contracts) was expressly off limits.

But we rejected the categorical distinction between inputs and outputs that the suppliers urged. Instead, we held that the

scope of the congressional directive that there be "*no administrative or judicial review*" turned on the relationship between the challenged decision and the agency action shielded from review. *Id.* at 409-11. We reasoned that the financial standards that determined a bidder's eligibility for a contract were "indispensable" to the ultimate contract decision, which could not be challenged in court. *Id.* at 409-10 ("If a bidder is found financially ineligible, its bid is rejected[.]"). Additionally, the statute barred judicial review of "the bidding structure" for such contracts, and the financial standards were "integral" to and "inextricably intertwined" with the Secretary's bidding structure. *Id.* at 411 (identifying each step in the bidding process that involved the challenged financial standards). In sum, we could not review a decision that was "indispensable" or "integral" to, or "inextricably intertwined" with, the unreviewable agency action. *Id.* at 409-11.

Following that reasoning, we cannot review the data that underlie the Secretary's estimate of Tampa General's amount of uncompensated care in 2014. As already described, to determine that amount, the Secretary used the number of Medicaid and Medicare SSI patients as a proxy for the population of uninsured low-income patients. 78 Fed. Reg. at 50,636. No other data factored into the Secretary's estimate of uncompensated care. A challenge to the data would "eviscerate the bar on judicial review." *El Paso*, 632 F.3d at 1278. Just like the financial standards in *Texas Alliance*, the underlying data here are "indispensable" and "integral" to, and "inextricably intertwined" with, the Secretary's estimate of Tampa General's amount of uncompensated care. 681 F.3d at 409, 411. Indeed, the data are the entire basis for the estimate. The bar on judicial review in section 1395ww(r)(3) therefore "expressly preclude[s]" Tampa General's challenge to the data, *id.* at 411, and we lack jurisdiction to consider it.

Tampa General's efforts to distinguish *Texas Alliance* fall short. First, the hospital invokes the canon of statutory interpretation that cautions against interpreting one provision in a way that renders another redundant. *Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1176-77 (2013) (discussing the surplusage canon). Tampa General contends that the statutory provision that bars judicial review of "[a]ny period selected by the Secretary" for the purpose of calculating Tampa General's DSH payment, 42 U.S.C. § 1395ww(r)(3)(B), would do no work if "estimate" were interpreted to bar review of anything that affects the estimate. This is so, Tampa General claims, because the period affects the estimate as well. According to Tampa General, *Texas Alliance* did not involve two such separate provisions, one of which would be deprived of "all meaning and effect" by the government's interpretation. Reply Br. 9 (emphasis omitted).

But our interpretation of "estimate" does not deprive the "period" provision of all meaning and effect. To be sure, in the part of the statute at issue, the period that the Secretary chooses affects her estimate. *See* 42 U.S.C. § 1395ww(r)(2)(C) (requiring the Secretary to "estimate" the "amount of uncompensated care" provided by each hospital "for a period selected by the Secretary"). But the statute's bar on judicial review of "[a]ny period selected by the Secretary" also encompasses two additional parts of the statute that are not at issue in this case. *See id.* § 1395ww(r)(2)(A)-(B). As applied to one of these provisions, the bar precludes review of periods that have nothing to do with any estimate the Secretary makes. *See id.* § 1395ww(r)(2)(B)(i) (requiring the Secretary to "calculate[]" the number of uninsured people nationwide "in the most recent period for which data is available" by looking to "estimates" from the Congressional Budget Office—not estimates made by the Secretary).

Even if our interpretation of "estimate" creates some overlap with the "period" provision in the specific paragraph at issue in this case, at times Congress "drafts provisions that appear duplicative of others—simply, in Macbeth's words, 'to make assurance double sure.'" *Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775, 782 (D.C. Cir. 1998); *see also Fort Stewart Sch. v. Fed. Labor Relations Auth.*, 495 U.S. 641, 646 (1990) (recognizing that Congress sometimes includes terms that are "technically unnecessary, and were inserted out of an abundance of caution").

Tampa General invokes another canon of statutory interpretation that applies where the context suggests that Congress's "mention of one thing" reasonably "impl[ies] the preclusion of alternatives." *Shook*, 132 F.3d at 782 (discussing the *expressio unius* canon). Tampa General contends that the bar on review of the period, which is one component of the estimate, shows that Congress left other components of the estimate, like the data, subject to review.

This argument fails for the same reason as the argument that the Secretary's interpretation creates redundancies within the statute. Although the period is a component of the Secretary's estimate in some provisions of the statute, in others it is *not* a component of any such estimate. Thus, "looking at the structure of the statute," *id.*, we doubt that by explicitly barring review of the period, Congress intended to *allow* review of the data underlying the Secretary's estimate. Instead, "a normal draftsman" would have foreclosed review of the period to emphasize that the period cannot be reviewed in challenges to calculations under *any* of the relevant statutory provisions—whether or not the period is connected to an estimate made by the Secretary. *Id.*

Finally, Tampa General argues that *Texas Alliance* is distinguishable because the bar on judicial review we considered there worked much differently than the bar on judicial review before us. In *Texas Alliance*, the statute precluded courts from reviewing the agency's ultimate decision whether to award a contract. By contrast, Tampa General argues, the statute here creates no bar to a court reviewing the Secretary's ultimate decision as to the amount of a hospital's DSH payment, but only her intermediate determination as to the estimate of a hospital's share of uncompensated care. To illustrate this difference, Tampa General suggests that a hospital could challenge a DSH payment that failed to take into account required statutory factors other than the estimates or periods chosen by the Secretary.

This is a distinction without a difference. The critical factor in *Texas Alliance* was not whether the statute barred from review the agency's ultimate determination or merely an intermediate step in reaching that decision. Rather, we were concerned with the close connection between the element being challenged and the decision that could not be challenged in court. *Texas Alliance*, 681 F.3d at 409-11. That analysis applies with equal force here. The dispositive issue is whether the challenged data are inextricably intertwined with an action that all agree *is* shielded from review, regardless of where that action lies in the agency's decision tree. Because the data here are inextricably intertwined with the Secretary's estimate of uncompensated care, Tampa General cannot challenge the Secretary's choice of data in court.

Tampa General makes a similar argument that we should read the bar here narrowly because Congress shielded from judicial challenge only two components of HHS's methodology—the estimates and periods—rather than the

entire methodology or the ultimate determination. In contrast, Tampa General points to other parts of the Affordable Care Act where Congress broadly precluded judicial review of ultimate payment amounts or entire methodologies for determining payments. *See, e.g.*, 42 U.S.C. § 1395ww(o)(11)(B)(i) (barring review of "the determination of" the "amount of the value-based incentive payment"); *id.* (barring review of the "methodology used to determine the amount of the value-based incentive payment"). But even viewing the bar here narrowly, the selection of data fits squarely within it. The data and the estimate are so closely intertwined that we cannot review either. As a result, we have no jurisdiction to review the Secretary's choice of data.

B

Tampa General also seeks to reframe its challenge as an attack on something other than an estimate by the Secretary. We are not persuaded.

Relying on our decision in *ParkView Medical Associates v. Shalala*, 158 F.3d 146 (D.C. Cir. 1998), Tampa General asserts that we should construe its complaint as a challenge to HHS's general rules leading to the estimate rather than as a challenge to the estimate itself. In *ParkView*, we said that even if judicial review of a decision is barred, "hospitals [are] free to challenge the general rules leading to" that decision. *Id.* at 148. This principle, according to Tampa General, allows the hospital to challenge the Secretary's refusal to use the data that Tampa General thinks most accurate.

As Tampa General recognizes, however, since our decision in *ParkView* we have clarified that judicial review is not permitted "when a procedure is challenged solely in order to reverse an individual . . . decision" that we otherwise cannot review. *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d

400, 405 (D.C. Cir. 2005). "The proposition that hospitals may challenge the *general rules* leading to denial" is "inapplicable" where "the hospital's challenge is no more than an attempt to undo" a shielded determination. *Id.* That fits what Tampa General is trying to do in this case. Tampa General has not brought a challenge to any general rules leading to the Secretary's estimate. Tampa General is simply trying to undo the Secretary's estimate of the hospital's uncompensated care by recasting its challenge to the Secretary's choice of data as an attack on the general rules leading to her estimate.

Finally, Tampa General attempts to repackage its arguments to fall within a line of cases in which we have found jurisdiction to review an agency's action that is *ultra vires*, *i.e.*, beyond the scope of its lawful authority. *See Sw. Airlines Co. v. TSA*, 554 F.3d 1065, 1071 (D.C. Cir. 2009). Because we presume Congress "rarely intends to foreclose review of action exceeding agency authority," we typically construe bars on judicial review to extend "no further than the Secretary's statutory authority" to make the challenged determination. *Amgen*, 357 F.3d at 112. Tampa General thus contends that because the statute directs the Secretary to base her estimates on "appropriate" data, 42 U.S.C. § 1395ww(r)(2)(C)(i), any estimate based on inappropriate data is *ultra vires*.

To challenge agency action on the ground that it is *ultra vires*, Tampa General must show a "patent violation of agency authority." *Indep. Cosmetic Mfrs. & Distribs., Inc. v. U.S. Dep't of Health, Educ. & Welfare*, 574 F.2d 553, 555 (D.C. Cir. 1978); *see also Qwest Corp. v. FCC*, 482 F.3d 471, 476 (D.C. Cir. 2007) (defining "*ultra vires*" action as "patently in excess of [the agency's] authority" (quoting *Wash. Ass'n for Television & Children v. FCC*, 712 F.2d 677, 682 (D.C. Cir.

1983))). A violation is "patent" if it is "[o]bvious" or "apparent." BLACK'S LAW DICTIONARY (10th ed. 2014). Tampa General's claimed violation is neither.

Tampa General relies heavily on our decision in *Southwest Airlines v. TSA*, but that decision does not help the hospital. The statute at issue in *Southwest Airlines* authorized the Transportation Security Administration (TSA) to charge airlines certain fees, but capped those fees at the amount that airlines paid "for screening passengers and property" in the era before the agency was formed. 554 F.3d at 1068 (quoting 49 U.S.C. § 44940(a)(2)(B)(i) (repealed)). Congress barred judicial review of "[d]eterminations of the Under Secretary" regarding the fee limitations. *Id.* at 1069 (quoting Pub. L. No. 107-71, 115 Stat. 597, 625 (2001)). But when TSA calculated the fees, it included the screening costs for *non*-passengers as well as for passengers. Even though we could not review the fee determinations made "for screening passengers and property," we could and did invalidate the fee determinations insofar as they included costs for screening *non*-passengers, because those cost calculations patently fell outside TSA's statutory authority. *See id.* at 1071-72.

Here, the Secretary's choice of data is not obviously beyond the terms of the statute. It is far from apparent that choosing March instead of April as the cutoff date for hospitals to update their Medicaid data was "[in]appropriate." 42 U.S.C. § 1395ww(r)(2)(C)(i). By asking us to review the appropriateness of the data the Secretary used to calculate Tampa General's DSH payment, Tampa General urges us to engage in the kind of "case-by-case review of the reasonableness or procedural propriety of the Secretary's individual applications" that Congress intended to bar. *Amgen*, 357 F.3d at 113. We will not permit Tampa General to "couch[]" this type of reasonableness challenge "in terms

14

of the agency's exceeding its statutorily-defined authority."
*Nw. Airlines, Inc. v. FAA*, 14 F.3d 64, 73 (D.C. Cir. 1994).

## IV

We affirm the district court and hold that 42 U.S.C.
§ 1395ww(r)(3) bars Tampa General's challenge.